IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Tajuan Lanika Frazier, | ) | C/A No.: 1:15-1819-RMG-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Carolyn W. Colvin, Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be affirmed.

I.      Relevant Background

        A.      Procedural History

        On April 9, 2012, Plaintiff protectively filed applications for DIB and SSI in which she alleged her disability began on January 30, 2010. Tr. at 82, 83. Her applications were denied initially and upon reconsideration. Tr. at 120–24, 129–30, 131–

32. On November 6, 2013, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Kelly Wilson. Tr. at 47–81 (Hr'g Tr.). The ALJ issued an unfavorable decision on December 16, 2013, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 25–44. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–6. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on April 28, 2015. [ECF No. 1].

      B.     Plaintiff's Background and Medical History

          1.     Background

Plaintiff was 45 years old at the time of the hearing. Tr. at 55. She completed high school. Tr. at 109. Her past relevant work ("PRW") was as a hair stylist and a call center operator. Tr. at 79. She alleges she has been unable to work since January 30, 2010. Tr. at 82, 83.

          2.     Medical History

On March 21, 2011, Plaintiff presented to Fredric Woriax, M.D. ("Dr. Woriax"), to establish treatment. Tr. at 255. She complained of high blood pressure, and her blood pressure was elevated at 184/108. Tr. at 255–56. She was 50 inches tall, weighed 202.6 pounds, and had a body mass index ("BMI") of 39.6 kg/m$^2$. Tr. at 256. She demonstrated no dysfunction on motor examination, and Dr. Woriax noted no abnormalities on physical examination. Tr. at 256–57. Dr. Woriax assessed malignant essential hypertension and dysmetabolic syndrome X. Tr. at 257.

2

Plaintiff presented to Cherise Fretwell, APRN ("Ms. Fretwell"), for a blood pressure check and medication refills on October 13, 2011. Tr. at 253. She complained of pain in her lower back and bilateral knees and difficulty with ambulation. *Id.* Ms. Fretwell observed edema, tenderness to palpation, and pain with motion of Plaintiff's bilateral knees. Tr. at 254. She prescribed Diclofenac Sodium and instructed Plaintiff to follow up in three months. Tr. at 255.

Plaintiff presented to Catherine Toomer, M.D. ("Dr. Toomer"), on February 1, 2012, with ongoing and worsening knee pain. Tr. at 252. Dr. Toomer observed Plaintiff to have swelling, tenderness, abnormal motion, crepitus, and pain with motion of her knees. *Id.* She indicated Plaintiff had an abnormal gait and demonstrated a limp. *Id.* She referred Plaintiff for x-rays of both knees. Tr. at 253.

On February 22, 2012, Plaintiff presented to Dr. Toomer, to discuss x-ray results. Tr. at 250. She indicated she was experiencing bilateral knee pain and swelling that was worsened by weight-bearing and extended activity. *Id.* Dr. Toomer observed Plaintiff to have swelling, tenderness on palpation, and pain with motion. Tr. at 251. She referred Plaintiff for magnetic resonance imaging ("MRI") of her knees. *Id.*

Plaintiff underwent MRIs of her bilateral knees on March 20, 2012. Tr. at 266–67. The MRI of Plaintiff's right knee showed severe chronic degenerative changes of all three compartments and a grossly abnormal medial meniscus that suggested chronic degenerative change with acute superimposed bucket-handle tear. Tr. at 266. The MRI of Plaintiff's left knee indicated severe degenerative changes that were complicated by

3

chondral injury at the medial compartment, complete loss of the medial meniscus, and oblique tear of the anterior lateral meniscus. Tr. at 267.

On May 1, 2012, Plaintiff presented to Kevin Ard, PA-C ("Mr. Ard"), with complaints of numbness in her right thigh and pain in her back, bilateral knees, and right thigh. Tr. at 264. She indicated she did a lot of bending and spent a lot of time on her feet. *Id.* She denied weakness and swelling. *Id.* X-rays indicated severe degenerative changes to the medial compartments of Plaintiff's bilateral knees with spurring. Tr. at 263. Mr. Ard indicated Plaintiff walked with a normal gait. Tr. at 264. He observed Plaintiff to have areas of tenderness to the medial aspects of both knees, but to have no obvious edema or effusion. *Id.* Plaintiff demonstrated normal range of motion ("ROM") to both knees and good strength in her lower extremities. *Id.* She was 4' 11" tall and weighed 198 pounds. *Id.* Mr. Ard noted Plaintiff had no tenderness in her lumbar spine, and a straight-leg raising test was negative. *Id.* He indicated that Plaintiff was most likely to benefit from an injection to her knees, but Plaintiff declined the injection. *Id.*

Plaintiff presented to Ty W. Carter, M.D. ("Dr. Carter"), on May 29, 2012, for an orthopedic follow up visit. Tr. at 303. Plaintiff complained of intermittent pain in her back and numbness in her right anterior thigh. *Id.* Dr. Carter observed Plaintiff to have no tenderness in her lumbar spine; full ROM of all her joints and her back; no redness, swelling, or warmth; no decreased sensation in her lower extremities; and good strength throughout. *Id.* An x-ray showed mild narrowing of the L5-S1 disc space, but no other abnormalities. *Id.* Dr. Carter indicated he would treat Plaintiff conservatively with Mobic and that Plaintiff may benefit from an MRI of her lumbar spine. *Id.*

4

Plaintiff followed up with Dr. Toomer to have her pain medication refilled on June 19, 2012. Tr. at 275. She weighed 199.1 pounds and had a BMI of 38.9 kg/m$^2$. Tr. at 276. Dr. Toomer indicated Plaintiff's knee was tender to palpation on ambulation and that Plaintiff complained of pain with motion of her knee. *Id.* However, she observed no edema, erythema, warmth, induration, or dislocation of the knee. *Id.* She noted Plaintiff's gait was abnormal and observed Plaintiff to be limping. *Id.*

On June 25, 2012, state agency medical consultant Rebecca Meriwether, M.D., completed a physical residual functional capacity ("RFC") evaluation and found that Plaintiff could perform work with the following limitations: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of two hours during an eight-hour workday; sit for a total of about six hours in an eight-hour workday; occasionally climbing ramps/stairs, balancing, stooping, and kneeling; and never climbing ladders/ropes/scaffolds, crouching, or crawling. Tr. at 88–90. Darla Mullaney, M.D., assessed the same limitations on September 26, 2012. Tr. at 106–08.

On August 21, 2012, Plaintiff presented to Dr. Toomer for medication refills and requested that Dr. Toomer complete disability paperwork. Tr. at 274. Plaintiff complained that her knee pain caused her difficulty with standing, walking, and sleeping. *Id.* She reported knee joint pain and swelling and indicated her knee had a clicking sensation and would lock up suddenly. *Id.* Dr. Toomer observed tenderness to palpation and pain with motion of the knee, but noted no edema or erythema. *Id.* She diagnosed osteoarthrosis of the knee and chronic pain. Tr. at 275.

Plaintiff presented to Gary Fischbach, M.D. ("Dr. Fischbach"), on October 5, 2012. Tr. at 284. She indicated that Dr. Toomer had not filled out disability paperwork and requested that Dr. Fischbach complete it. *Id.* Dr. Fischbach noted that Plaintiff was instructed to discontinue use of a strap-on stabilizing knee brace because the course of treatment was completed. *Id.* He indicated Plaintiff weighed 202.2 pounds and had a BMI of 39.5 kg/m$^2$. *Id.* Dr. Fischbach informed Plaintiff that he could not complete the disability paperwork because it would require a functional capacity evaluation ("FCE"). *Id.* He suggested Plaintiff's attorney contact Hitchcock Rehabilitation to determine if they still performed FCEs. *Id.*

On November 16, 2012, Plaintiff complained to Dr. Fischbach of pain in her bilateral knees. Tr. at 291. She weighed 204.1 pounds and had a BMI of 39.9 kg/m$^2$. *Id.* Dr. Fischbach noted no abnormalities. Tr. at 291–92. He refilled Plaintiff's medications and instructed her to follow up in three months. Tr. at 292.

On December 10, 2012, Plaintiff indicated to Dr. Carter that her back was doing well, but that she continued to experience bilateral knee pain. Tr. at 302. She requested that Dr. Carter prescribe Tylenol with Codeine and stated that Dr. Fischbach had indicated he would no longer prescribe pain medications. *Id.* Dr. Carter indicated Plaintiff was not a good candidate for total knee arthroplasty and did not want injections, surgery, or a knee brace. *Id.* He noted that Plaintiff only wanted for her pain medications to be refilled. *Id.* He informed Plaintiff that he did not treat long-term pain and that she would need to follow up with a pain management physician. *Id.* He prescribed Tramadol and

6

told Plaintiff that she could return to the office if she decided to pursue knee injections or potential surgery. *Id.*

Plaintiff followed up with Dr. Carter on March 8, 2013. Tr. at 301. She complained of back pain and worsening knee pain. *Id.* Dr. Carter indicated he did not feel that Plaintiff needed knee replacement at that time because she was only 43-years-old. *Id.* He stated Plaintiff could benefit from arthroscopy and referred her to Dr. Holford for a consultation. *Id.* He instructed Plaintiff to follow up with Dr. Fischbach for pain management. *Id.*

Plaintiff followed up with Dr. Fischbach on April 5, 2013, for routine care and medication refills. Tr. at 289. She indicated that the orthopedist had told her that she had no cartilage in her knees, but was too young for knee replacement. *Id.* Plaintiff weighed 194 pounds and her BMI was 37.9 kg/m$^2$. *Id.* Dr. Fischbach noted no abnormalities on examination. Tr. at 289–90. He discontinued Tylenol with Codeine and prescribed Tramadol four times daily, as needed for pain. Tr. at 290.

Plaintiff presented to Douglas E. Holford, M.D. ("Dr. Holford"), for further evaluation of knee pain on March 11, 2013. Tr. at 299. Dr. Holford noted that Plaintiff was 4' 11" tall and weighed 195 pounds. *Id.* He indicated Plaintiff had three to 75 degrees of flexion and tenderness along her medial joint line. *Id.* He observed crepitation of the medial compartment and the undersurface of the patella. *Id.* He stated x-rays showed bone-on-bone involvement of the medial joints and marked osteophyte formation around the posterior aspect of Plaintiff's bilateral knees. *Id.* He indicated Plaintiff also had early degenerative joint disease of the lateral joints. *Id.* Dr. Holford discussed

7

Orthovisc knee injections with Plaintiff, but he indicated they would not give her much benefit because her knees were bone-on-bone. *Id.* He stated "I think she will qualify for disability under 2 major weightbearing joints, prolonged standing, et cetera." *Id.*

Plaintiff followed up with Dr. Holford on July 10, 2013. Tr. at 296–98. Plaintiff rated her pain as a six out of ten and indicated it was aggravated by weight-bearing, walking, running, climbing stairs, bending, movement, and prolonged sitting. Tr. at 296. Dr. Holford noted that Plaintiff was 4' 11" tall and weighed 185 pounds. *Id.* He indicated Plaintiff's left knee was tender to palpation at the medial joint space line, but had full ROM and normal stability. Tr. at 297. He observed Plaintiff's right knee to be tender to palpation at the medial joint space line and popliteal fossa, but to have 5/5 strength and normal stability. *Id.*

On July 12, 2013, Plaintiff presented to Dr. Fischbach for routine care and medication refills. Tr. at 307. She indicated that she felt "ok." *Id.* She weighed 180.2 pounds and had a BMI of 35.2 kg/m$^2$. *Id.* Dr. Fischbach described Plaintiff's musculoskeletal exam as "normal." *Id.* He refilled Plaintiff's prescriptions for Tramadol for pain, Meloxicam for arthritis, and Hydrochlorothiazide-Lisinopril for hypertension. Tr. at 308.

> C.    The Administrative Proceedings

>> 1.    The Administrative Hearing

>>> a.    Plaintiff's Testimony

At the hearing on November 6, 2013, Plaintiff testified she last worked as a telemarketer in 2010. Tr. at 55. She stated she was laid off from her job and collected

unemployment compensation until 2012. Tr. at 57. She indicated she applied for jobs during the time that she was collecting unemployment. *Id.*

Plaintiff testified she was treated by Dr. Holford. Tr. at 61. She indicated that both Dr. Holford and Dr. Carter had recommended she undergo injections to both knees, but that she refused because of a fear of needles and the particular length and thickness of the needles that would be used to administer the injections. *Id.* She testified she had declined arthroscopic surgery because Dr. Holford indicated it would not help her pain. Tr. at 62–63. She stated Dr. Holford indicated she was not a candidate for knee replacement because she was under age 50. *Id.*

Plaintiff testified she had arthritis in her lower back that caused her to experience pain and numbness in her thighs and feet. Tr. at 64. She stated that she had weighed as much as 300 pounds, but had lost around 100 pounds over the prior two-year period. Tr. at 65. She indicated she had attempted to lose weight because her doctors had suggested it would help her knee problems, but that her knee pain had only increased. *Id.* She stated she had weighed 182 or 183 pounds at her last doctor's visit. *Id.*

Plaintiff indicated she started using a walker at the beginning of the year. Tr. at 69. She stated she had to rest more frequently while walking to and from her daughter's bus stop before she started using the walker. *Id.* She indicated she could lean on her walker if there was nowhere for her to sit. *Id.* She testified that she used a cane before she started using the walker. *Id.* Plaintiff denied that a cane or walker had been prescribed by her physicians, but stated that Dr. Carter had told her that she may need a device for support

and stability. *Id.* She indicated she typically either used a cane or held on to the wall or furniture when moving about her house. Tr. at 70.

Plaintiff testified that her pain necessitated that she elevate her legs after being out for about an hour. Tr. at 58. She stated she could sit for five to 10 minutes before her feet went numb. Tr. at 64. She testified she also experienced numbness in her hands. *Id.*

Plaintiff testified that she lived in her mother's house. Tr. at 66. She indicated her mother was retired and had recently been diagnosed with cancer. Tr. at 66–67. She stated she had an eight- and a 14-year-old daughter who lived with her. Tr. at 66. She indicated she had never had a driver's license because she had lived in Chicago and relied on public transit. Tr. at 67. She stated she could dress herself, but had to sit to dress. Tr. at 67–68. She testified that her oldest daughter did most of the household chores and that her mother was able to care for her own needs. Tr. at 68. She indicated that she spent most of a typical day either lying in bed or sitting in a chair with her legs elevated. Tr. at 71. She testified that she read the newspaper and watched television. Tr. at 72. She stated her sisters sometimes shopped for her groceries and indicated that she used a motorized cart if she went to the grocery store. Tr. at 71. She indicated she attended church, but sat close to the bathroom and was up and down during the service. Tr. at 74.

Plaintiff testified she was prescribed Meloxicam for arthritis and Tramadol for pain. Tr. at 59. She stated the only side effects she experienced from her medications were dry mouth and thirst. Tr. at 60. She indicated she had worn bilateral knee braces since 2011. Tr. at 74.

b.    Vocational Expert Testimony

Vocational Expert ("VE") Benson Hecker reviewed the record and testified at the hearing. Tr. at 78–80. The VE categorized Plaintiff's PRW as a hair stylist, *Dictionary of Occupational Titles* ("*DOT*") number 332.271-018, as light with a specific vocational preparation ("SVP") of six and a phone call center operator, *DOT* number 332.271-018, as sedentary with an SVP of four. Tr. at 79. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform sedentary work with the following restrictions: no pushing or pulling with the lower extremities; occasionally balancing, stooping, kneeling, and climbing ramps and stairs; and no crouching, crawling, or climbing ladders, ropes, or scaffolds. *Id.* The VE testified that the hypothetical individual could perform Plaintiff's PRW as a call center operator. *Id.* The ALJ asked the VE to assume the same restrictions in the first hypothetical question, but to further assume the individual would need to elevate her legs to waist height for at least two hours during the workday. *Id.* She asked if the individual could perform Plaintiff's PRW or any other work in the regional or national economy. *Id.* The VE testified the individual could perform no work. *Id.*

2.    The ALJ's Findings

In her decision dated December 16, 2013, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2015.
2.    The claimant has not engaged in substantial gainful activity since January 30, 2010, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et. seq.*).

3.    The claimant has the following severe impairment: degenerative joint disease of both knees and obesity (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except that she can perform no pushing or pulling with her lower extremities. She can never climb ladders, ropes, or scaffolds, crouch, or crawl. She can occasionally climb stairs or ramps, balance, stoop, and kneel.

6.    The claimant is capable of performing past relevant work as a phone call center operator. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7.    The claimant has not been under a disability, as defined in the Social Security Act, from January 30, 2010, through the date of this decision (20 CFR 404.1520(f) and 416.920(f).

Tr. at 30–41.

II.    Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)    the ALJ did not properly evaluate whether Plaintiff was disabled under Listing 1.02;

2)    the ALJ did not adequately consider Dr. Holford's opinion; and

3)    the ALJ failed to properly evaluate Plaintiff's credibility.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in her decision.

A.     Legal Framework

1.     The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[1] (4) whether such

---

[1]  The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. §§ 404.1525, 416.925. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. §§ 404.1526, 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146

13

impairment prevents claimant from performing PRW;[2] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. §§ 404.1520, 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, §§ 404.1520(a), (b), 416.920(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v.*

---

(1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[2] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, she may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. §§ 404.1520(h), 416.920(h).

*Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

2.     The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157– 58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is

substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.     Analysis

1.     Listing 1.02

Plaintiff argues the ALJ did not adequately consider whether her impairments supported a finding of disability under Listing 1.02. [ECF No. 13 at 13–22]. She maintains the ALJ only found that an inability to ambulate effectively was not established by the evidence, but did not find that she had no major dysfunction of a weight-bearing joint. *Id.* at 14. She contends the ALJ did not correctly describe the requirements of the Listing and only considered the evidence that supported her conclusion. *Id.* at 15–20.

The Commissioner argues the ALJ properly concluded that Plaintiff's impairments were not *per se* disabling at step three of the evaluation process. [ECF No. 15 at 6].

"For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (emphasis added). It is not enough that the impairments have the diagnosis of a listed impairment; the claimant must also meet the criteria found in the Listing of that impairment. 20 C.F.R. §§ 404.1525(d), 416.925(d). The Commissioner compares the symptoms, signs, and laboratory findings of the impairment, as shown in the medical evidence, with the medical criteria for the listed impairment. 20 C.F.R. §§ 404.1508, 416.908. The Commissioner can also determine that the claimant's impairments are medically

equivalent to a Listing, which occurs when an impairment is at least equal in severity and

duration to the criteria of a Listing. 20 C.F.R. §§ 404.1526(a), 416.926(a).

Listing 1.02 provides in pertinent part:

1.02 Major Dysfunction of a joint(s) (due to any cause):
Characterized by gross anatomical deformity (e.g. subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s).

With:

A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively as defined in 1.00B2b.

20 C.F.R., Pt. 404, Subpt. P, App'x. 1, §1.02.

The following definition of "inability to ambulate effectively" is provided in §

1.00B2b:

Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. (Listing 1.05C is an exception to this general definition because the individual has the use of only one upper extremity due to amputation of a hand.).

20 C.F.R., Pt. 404, Subpt. P, App'x. 1, §1.00B2b(1). The regulation further states:

To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two

canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

20 C.F.R., Pt. 404, Subpt. P, App'x. 1, §1.00B2b(2).

The ALJ indicated she had considered Listing 1.02. Tr. at 31. She acknowledged Dr. Holford's opinion that Plaintiff would "qualify for disability under 2 major weightbearing joints, prolonged standing, etc." and recognized that Dr. Holford was "referring to the provisions of Listing 1.02A." *Id.* However, she found that Dr. Holford's opinion was inconsistent with the evidence of record, which showed that Plaintiff could ambulate without the use of an assistive device. *Id.* She further explained her reasons for concluding that Plaintiff's impairment did not meet or equal Listing 1.02 as follows:

> Under 1.02 and 1.00(b) an inability to ambulate effectively means an extreme limitation of the ability to walk that interferes very seriously with the individual ability to independently initiate, sustain, or complete activities. This generally requires the use of a hand held assistive device that limits the functioning of both upper extremities. In this case, there is no evidence that any physician has prescribed the claimant a walker or bilateral canes that would limit functioning of the upper extremities. During a May 2012 consultative examination, the claimant was described as walking with a normal gait (Exhibit 2F, p. 1–3). During the claimant's most recently documented examinations performed in July 2013, Dr. Holford made no mention of the claimant having a significant limp (Exhibit 7F, p. 1–3, Exhibit 8F, p. 1). Therefore, I conclude that the claimant is not unable to ambulate effectively as required by Listing 1.02A.

Tr. at 31–32.

The ALJ failed to discuss whether Plaintiff's impairment met the requirements in the introductory paragraph to Listing 1.02. *See* Tr. at 31. However, her failure to discuss

18

the signs and symptoms described in the introductory paragraph was inconsequential because she concluded that Plaintiff's impairment did not satisfy the paragraph "A" criteria under the Listing,[3] and an impairment must satisfy all the criteria under the Listing to meet or equal the Listing. *See Sullivan*, 493 U.S. at 530; 20 C.F.R. §§ 404.1525(d), 416.925(d).

Although Plaintiff maintains that she required the initial use of a cane and the eventual use of a walker to ambulate, she contends that she did not have to prove a need for these devices for the ALJ to find that her impairment met or equaled the requirements of Listing 1.02A. [ECF No. 13 at 16–17]. She argues that the record shows she had an inability to ambulate effectively as described in the examples in Listing 1.02B2b(2). *Id.* The court was presented with a similar argument in *Hosonitz v. Astrue*, No.: 4:08-3086-HMH-TER, 2010 WL 755651, at *5 (Mar. 1, 2010). In considering the argument, the court looked to the following explanation the Commissioner provided at the time the introductory comments to Listing 1.00 were adopted:

> The criteria do not require an individual to use an assistive device of any kind. The first sentence of final 1.00B2b stresses that "[i]nability to ambulate effectively means an extreme limitation of the ability to walk." The ensuing explanation and examples should make it clear that this applies to anyone who cannot walk adequately. The explanation is intended to mean that individuals who can only walk with the aid of hand-held assistive devices requiring the use of both upper extremities would meet the

---

[3] Listing 1.02 requires that an individual's impairment meet the criteria in the introductory paragraph and the criteria in either paragraph "A" or paragraph "B." Plaintiff does not allege and the record does not support a finding that Plaintiff's impairments meet the paragraph "B" criteria under the Listing, which requires "[i]nvolvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in an inability to perform fine and gross movements effectively, as defined in 1.00B2c."

definition of inability to ambulate effectively. In addition, anyone with an ineffective gait who cannot use assistive devices would also meet the definition of inability to ambulate effectively.

*Hosonitz*, 2010 WL 755651, at *5, citing *Revised Medical Criteria for Determination of Disability, Musculoskeletal System and Related Criteria*, 66 Fed. Reg. 58010-01, 58027–28 (Nov. 19, 2001). Nevertheless, the court found that the ALJ did not err in relying, in part, on Listing 1.00B2b(1)'s general definition of ineffective ambulation, which requires the use of a hand-held assistive device or devices that limit the functioning of both upper extremities. *Hosonitz*, 2010 WL 755651, at *5.

Here, the ALJ similarly relied on Listing 1.00B2b(1)'s general definition of an inability to ambulate effectively in concluding that the evidence showed that Plaintiff was able to ambulate without the use of an assistive device. *See* Tr. at 31. She pointed out that no physician had prescribed a walker or a cane. Tr. at 31, 39. In light of the court's decision in *Hosonitz*, and in the absence of any record evidence to suggest Plaintiff was unable to walk or to use an assistive device to ambulate, the undersigned recommends the court find the ALJ properly relied upon the fact that Plaintiff's physicians had not prescribed an assistive device that required use of the bilateral upper extremities.

Furthermore, the undersigned notes that the ALJ did not merely rely on the fact that Plaintiff was prescribed no assistive devices, but also cited additional evidence to support her conclusion that Plaintiff was able to ambulate effectively. *See* Tr. at 31 (noting that a May 2012 examination note indicated Plaintiff walked with a normal gait and that Dr. Holford failed to document any significant limp in July 2013).

Although Plaintiff contends that the ALJ ignored multiple indications in the record that she had difficulty walking, the undersigned notes that the ALJ explicitly considered the evidence related to abnormal gait, as well as evidence consistent with a normal gait. *See* Tr. at 32 (acknowledging that Plaintiff alleged her knee problems caused her difficulty performing routine and household tasks and prevented her from walking any distance or sitting or standing for long periods), 33 (noting that Plaintiff had edema and tenderness to palpation of her knees and that ROM elicited pain on October 23, 2011; acknowledging Dr. Toomer's observation that Plaintiff had an abnormal gait and stance and walked with a limp on February 1, 2012), 34 (stating that Mr. Ard observed Plaintiff to have full ROM of both knees and to walk with a normal gait on May 1, 2012; indicating that Dr. Carter observed Plaintiff to have full ROM to all her joints and good strength and sensation on May 29, 2012), 35 (noting that Dr. Holford observed Plaintiff to have decreased knee flexion, tenderness along her medial joint line, and crepitation of the medial compartment and the undersurface of the patella on March 11, 2013), 36 (reciting Dr. Holford's findings of tenderness to palpation at the bilateral medial joint space lines and right popliteal fossa, normal varus and valgus strength, negative anterior and posterior drawer signs and Lachman's test, positive McMurray's test in both knees, and 5/5 bilateral knee strength on July 10, 2013; indicating that Dr. Fischbach observed Plaintiff to have a normal musculoskeletal examination on July 12, 2013), 37 (noting that Plaintiff testified she used a walker and brought a walker to the hearing and stated that she had previously used a cane). To the extent that Plaintiff argues the ALJ erred in weighing this conflicting evidence, the undersigned finds her argument unavailing

21

because it is not within the province of a reviewing court to reweigh the evidence. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) ("Ultimately, it is the duty of the administrative law judge reviewing a case, and not the responsibility of the courts, to make findings of fact and to resolve conflicts in the evidence."), citing *King v. Califano*, 599 F.2d 597, 599 (4th Cir. 1979). The ALJ's decision reflects that she considered and weighed the conflicting evidence. In light of the foregoing, the undersigned recommends the court find that substantial evidence supported the ALJ's conclusion that Plaintiff's impairment did not meet or equal Listing 1.02.

2.    Treating Physician's Opinion

On March 11, 2013, Dr. Holford stated "I think she will qualify for disability under 2 major weightbearing joints, prolonged standing, et cetera." Tr. at 299.

Plaintiff argues the ALJ did not properly evaluate Dr. Holford's opinion under the provisions of 20 C.F.R. §§ 404.1527(c)[4] and SSRs 96-2p and 96-5p. [ECF No. 13 at 23–28]. She maintains the ALJ failed to provide good reasons for her decision to dismiss Dr. Holford's opinion. *Id.* at 26. She contends that Dr. Holford's findings conflicted with the ALJ's conclusion that she could perform sedentary work because Dr. Holford assessed her knee flexion to be limited to 75 degrees and a normal sitting position requires 90 degrees of flexion. *Id.* at 27.

---

[4] Plaintiff cites 20 C.F.R. § 404.1527(d), but refers to the language in 20 C.F.R. § 404.1527(c). [ECF No. 13 at 23]. The undersigned notes that the former § 404.1527(d) was redesignated as § 404.1527(c) on March 26, 2012. Based on Plaintiff's argument, the undersigned concludes that Plaintiff erroneously cited to a prior version of the regulation and considers the criteria set forth in 20 C.F.R. § 404.1527(c).

The Commissioner argues that Dr. Holford's opinion was not supported by his treatment notes. [ECF No. 15 at 9]. She further maintains that Dr. Holford provided no opinion about Plaintiff's ability to sit and, thus, his opinion was not inconsistent with the ALJ's finding that Plaintiff could perform sedentary work. *Id.* She contends the ALJ explained that Dr. Holford's opinion was inconsistent with other evidence of record. *Id.* at 11.

The Social Security Administration's ("SSA's") regulations require that ALJs carefully consider medical source opinions of record. SSR 96-5p. ALJs must accord controlling weight to the opinions of treating physicians that are well-supported by medically-acceptable clinical and laboratory diagnostic techniques and that are not inconsistent with the other substantial evidence of record. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); SSR 96-2p.

Opinions from medical sources that apply vocational factors or that state that an individual is disabled, has an impairment that meets or equals a Listing, or has a particular RFC are considered to be opinions on issues reserved to the Commissioner. 20 C.F.R. §§ 404.1527(d)(1), (2), 416.927(d)(1), (2); SSR 96-5p. These particular opinions are accorded no particular significance. 20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3); SSR 96-5p.

Should the ALJ determine that the treating physician's opinion is not entitled to controlling weight, the ALJ is required to evaluate all the opinions of record based on the factors in 20 C.F.R. §§ 404.1527(c) and 416.927(c). 20 C.F.R. §§ 404.1527(c), 416.927(c); SSR 96-2p. The relevant factors include (1) the examining relationship

between the claimant and the medical provider; (2) the treatment relationship between the claimant and the medical provider, including the length of the treatment relationship and frequency of treatment and the nature and extent of the treatment relationship; (3) the supportability of the medical provider's opinion in his or her own treatment records; (4) the consistency of the medical opinion with other evidence in the record; and (5) the specialization of the medical provider offering the opinion. *Johnson*, 434 F.3d at 654; 20 C.F.R. §§ 404.1527(c), 416.927(c).

ALJs are also guided in weighing the relevant factors by the provisions of 20 C.F.R. §§ 404.1527(c) and 416.927(c). A treating source's opinion generally carries more weight than any other opinion evidence of record, even if it is not well-supported by medically-acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). However, "the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001), citing *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992). Medical opinions that are adequately explained by the medical source and supported by medical signs and laboratory findings should be accorded greater weight than uncorroborated opinions. 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3). "[T]he more consistent an opinion is with the record as a whole, the more weight the Commissioner will give it." *Stanley v. Barnhart*, 116 F. App'x 427, 429 (4th Cir. 2004), citing 20 C.F.R. § 416.927(d) (2004). Finally, medical opinions from specialists regarding medical issues related to their particular areas of specialty should carry greater weight than opinions

24

from physicians regarding impairments outside their areas of specialty. 20 C.F.R. §§ 404.1527(c)(5), 416.927(c)(5).

This court should not disturb the ALJ's weighing of the medical opinion evidence of record "absent some indication that the ALJ has dredged up 'specious inconsistencies,' *Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992), or has not given good reason for the weight afforded a particular opinion." *Craft v. Apfel*, 164 F.3d 624 (Table), 1998 WL 702296, at *2 (4th Cir. 1998) (per curiam). ALJs are not required to expressly discuss each factor in 20 C.F.R. §§ 404.1527(c) and 416.927(c), but their decisions should demonstrate that they considered and applied all the factors and accorded each opinion appropriate weight in light of the evidence of record. *See Hendrix v. Astrue*, No. 1:09-1283-HFF, 2010 WL 3448624, at *3 (D.S.C. Sept. 1, 2010).

The ALJ initially discussed Dr. Holford's opinion in evaluating whether Plaintiff's impairment met or equaled Listing 1.02. Tr. at 31. She acknowledged Dr. Holford's status as a treating physician, but pointed out that an opinion on whether an individual's impairment meets a Listing is an issue reserved to the Commissioner and is entitled to no particular weight. *Id.* The ALJ gave no weight to Dr. Holford's interpretation of the Listings. Tr. at 40.

The ALJ stated that physical examinations by Dr. Carter and Dr. Holford showed Plaintiff to have full ROM, normal gait and stability, and no limp at times. Tr. at 40. The ALJ recognized that Dr. Holford gave no opinion on Plaintiff's ability to sit and found that his opinion was not inconsistent with a finding that Plaintiff could perform sedentary

work. Tr. at 39. Thus, the ALJ accorded substantial weight to Dr. Holford's opinion that Plaintiff was limited in her ability to perform prolonged standing. Tr. at 40.

A review of the record reveals that the ALJ considered and weighed the relevant factors under 20 C.F.R. §§ 404.1527(c) and 416.927(c). She considered Dr. Holford's status as an examining and treating physician. *See* Tr. at 35–36 (discussing Plaintiff's treatment visits with Dr. Holford). She cited specific examination notes and discussed the supportability of Dr. Holford's opinion. *See* Tr. at 31–32 (indicating that Dr. Holford made no mention of Plaintiff having a limp in July 2013), 35–36 (discussing the results of objective testing on March 11, 2013, and July 10, 2013). She also discussed inconsistencies between Dr. Holford's opinion and the other evidence of record. *See* Tr. at 31 ("During a May 2012 examination, the claimant was described as walking with a normal gait"), 40 ("The claimant's physical examinations, including examinations by Dr. Carter and Dr. Holford July of 2013 (Exhibit 7F, p. 1–3), have shown that she has full range of motion, normal gait and stability, and no limp at times."). While the ALJ did not specifically cite Dr. Holford's specialty as an orthopedic surgeon, her discussion of the reason for a referral to Dr. Holford suggests that she was aware of Dr. Holford's specialization. *See* Tr. at 35 (indicating that Dr. Carter referred Plaintiff to Dr. Holford for an opinion about possible arthroscopy).

The undersigned recommends the court find the ALJ appropriately gave no weight to Dr. Holford's interpretation of the Listings. Dr. Holford's suggestion that Plaintiff met Listing 1.02A was entitled to no particular weight because it was an opinion on an issue reserved to the Commissioner. *See* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). Dr.

26

Holford's opinion contained no meaningful consideration of the Listing or citation of objective evidence to support a finding that Plaintiff met Listing 1.02. He indicated Plaintiff would have difficulty with "prolonged standing," but Listing 1.02 addresses the ability to ambulate. *See* 20 C.F.R., Pt. 404, Subpt. P, App'x. 1, §1.02; *see also* 66 Fed. Reg. 58010-01, 58013 ("Final 1.00B2b addresses only an individual's ability to walk, not the ability to stand.").

The ALJ further explained that she gave no weight to Dr. Holford's opinion that Plaintiff met Listing 1.02A because it was unsupported by his own treatment notes and those of Dr. Carter that showed Plaintiff to have full ROM, normal gait and stability, and no limp at times. Tr. at 40. As discussed above, the ALJ's decision reflects a thorough consideration of the evidence regarding Plaintiff's ability to ambulate.

Although the ALJ rejected Dr. Holford's opinion that Plaintiff met Listing 1.02A, she did not reject all of the opinion, but instead found that the evidence supported the notion that Plaintiff was unable to engage in prolonged standing. *See* Tr. at 40. She further found that Dr. Holford's opinion was consistent with a finding that Plaintiff could perform sedentary work. *See id.* While Plaintiff argues that a finding that she could maintain a seated position was inconsistent with Dr. Holford's finding that her knee flexion was limited to 75 degrees, the ALJ noted that Dr. Holford made no mention of Plaintiff's ability to sit and that no physician had indicated Plaintiff was required to elevate her legs while sitting. *See* Tr. at 39. The ALJ acknowledged Dr. Holford's observation of Plaintiff's reduced knee flexion in March 2013, but also noted that subsequent examinations were generally normal. *See* Tr. at 36 (discussing Dr. Holford's

27

observations of tenderness to palpation, but normal varus and valgus strength in both knees, 5/5 strength, and negative anterior and posterior drawer signs and Lachman's test on July 10, 2013; noting that Dr. Fischbach stated a musculoskeletal exam was normal on July 12, 2013), 40 (stating that Dr. Holford found Plaintiff to have full ROM, normal gait and stability, and no limp in July 2013[5]). In light of the foregoing, the undersigned recommends the court find that substantial evidence supported the ALJ's decision to accept Dr. Holford's opinion that Plaintiff could not engage in prolonged standing and to find that it was not inconsistent with a determination that she could perform sedentary work.

### 3. Credibility Assessment

Plaintiff argues the ALJ did not properly evaluate her credibility. [ECF No. 13 at 28–36]. She maintains the ALJ failed to adequately explain her reasons for rejecting the allegations that she needed to elevate her legs and use a cane or walker. *Id.* at 29. She contends that the ALJ should have considered a later onset date and erred in finding that she was not disabled because of her receipt of unemployment benefits and the absence of reports of significant knee pain prior to 2012. *Id.* at 32. She argues the ALJ discounted her credibility because she rejected treatment options, but failed to consider her reasons for rejecting those options. *Id.* at 33. She maintains her activities of daily living ("ADLs") were not inconsistent with a finding that she was disabled. *Id.* at 34–35. She contends the ALJ's credibility finding was ambiguous because the ALJ found that her impairments

---

[5] Dr. Holford's treatment note from July 10, 2013, indicated Plaintiff had full ROM of her left knee, but did not specify the results of ROM testing of the right knee. *See* Tr. at 297.

"could possibly cause the alleged symptoms," but did not determine whether her impairments could be expected to produce the symptoms she alleged. *Id.* at 36.

The Commissioner argues the ALJ relied on substantial evidence to support her conclusion that Plaintiff's allegations were not entirely credible. *Id.* at 13. She points out that the ALJ noted that Plaintiff did not report significant knee pain until long after her alleged disability onset date of January 30, 2010. *Id.* at 14. She contends that Plaintiff collected unemployment benefits and looked for work from 2010 to 2012 and did not apply for DIB until her unemployment compensation ended. *Id.* She argues the ALJ cited conflicts between Plaintiff's statements and the medical records. *Id.* She maintains Plaintiff's ADLs supported the ALJ's finding that she could perform a limited range of sedentary work. *Id.* at 15.

In considering symptoms such as pain, fatigue, shortness of breath, weakness, or nervousness, the ALJ should first "consider whether there is an underlying medically determinable physical or mental impairment(s)—i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques—that could reasonably be expected to produce the individual's pain or other symptoms." SSR 96-7p. After determining that the individual has a medically-determinable impairment that could reasonably be expected to produce the alleged symptoms, the ALJ should evaluate the intensity, persistence, and limiting effects of her symptoms to determine the limitations they impose on her ability to do basic work activities. *Id.* If the individual's statements about the intensity, persistence, or limiting effects of her symptoms are not substantiated by the objective medical evidence, the ALJ must consider the individual's credibility in

light of the entire case record. *Id.* The ALJ must consider "the medical signs and laboratory findings, the individual's own statements about the symptoms, any statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record." *Id.* In addition to the objective medical evidence, ALJs should also consider the following when assessing the credibility of an individual's statements:

1.    The individual's daily activities;

2.    The location, duration, frequency, and intensity of the individual's pain or other symptoms;

3.    Factors that precipitate and aggravate the symptoms;

4.    The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5.    Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6.    Any measure other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7.    Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Id.*

The ALJ must specify her reasons for the finding on credibility, and her reasons must be supported by the evidence in the case record. *Id.* Her decision must clearly

indicate the weight she accorded to the claimant's statements and the reasons for that weight. *Id.*

A review of the record indicates the ALJ articulated her credibility finding. The ALJ found that Plaintiff's medically-determinable impairments could possibly cause the alleged symptoms, but that Plaintiff's statements concerning the intensity, persistence, and limiting effects of those symptoms were not entirely credible. Tr. at 38. Thus, the ALJ found that Plaintiff had medically-determinable impairments that could reasonably be expected to produce the pain and other symptoms she alleged, but determined that the intensity, persistence, and limiting effects of her symptoms did not impose all the limitations she alleged on her ability to do basic work activities. *See* SSR 96-7p. She indicated she carefully considered Plaintiff's testimony with respect to her pain and functional limitations. Tr. at 40. She stated she could not assess Plaintiff's credibility analytically in absolute terms, but could measure it by degree. *Id.* She found that Plaintiff had a history of degenerative joint disease in her knees and obesity that could be expected to cause her some pain, but that Plaintiff's clinical examinations and objective test results had not revealed any acute or chronic abnormalities that would be severe enough to prevent her from performing at least some sedentary work activity. Tr. at 40–41. She indicated Plaintiff had received minimal and conservative treatment and maintained the ability to perform sedentary activities of daily living. Tr. at 41. Thus, the ALJ found that Plaintiff's pain reduced her RFC to the sedentary level, but did not preclude the performance of a reduced range of sedentary work.

The ALJ's decision reflects consideration of Plaintiff's allegations that she required use of a cane and walker and needed to elevate her legs. The ALJ referenced Plaintiff's testimony that she used a walker and had previously used a cane to ambulate. Tr. at 37. She noted that Plaintiff brought the walker to the hearing and used it to enter the hearing room. *Id.* She indicated that she rejected Plaintiff's testimony regarding her need for a cane or walker because there was no evidence in the record that any of her treating doctors had ever prescribed a cane or walker for treatment. Tr. at 39. She also stated there was no medical evidence that Plaintiff had any impairment that would reasonably be expected to produce numbness in her legs. Tr. at 40. She pointed out that Dr. Carter and Dr. Holford had observed Plaintiff to have full ROM, normal gait and stability, and no limp at times. *Id.* The ALJ cited Plaintiff's testimony that she could not perform a job that allowed her to sit for most of the day because of a need to elevate her legs. Tr. at 39. However, she pointed out that no evidence suggested Plaintiff had impaired circulation in her lower extremities that would require her to elevate her legs throughout the day. Tr. at 40.

The ALJ considered that Plaintiff had rejected all treatment suggestions other than pain medication and found that her conservative treatment was inconsistent with the functional limitations she alleged. Pursuant to SSR 96-7p, ALJs may consider an individual's statements to "be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure." However, ALJs are cautioned against drawing any inferences about an

individual's symptoms and their functional effects without considering the individual's explanations for failing to seek treatment or to follow the prescribed treatment. SSR 96-7p. The ALJ pointed out that Plaintiff "refused short-term (steroid injections), medium-term (injections of compounds to ease and improve the function of her joints), and longer-term (arthroscopic surgery) treatment of her knees." Tr. at 39. She stated that, while Plaintiff testified that she had "used bilateral knee braces since 2011, she told Dr. Carter in December of 2012 that she did not want injection therapy, surgery, or a knee brace; she just wanted medication." *Id.* The ALJ indicated there was no evidence that Plaintiff had "sought or received long-term pain management treatment with narcotic medications" and that "[h]er failure to secure long-term systematic treatment with narcotic medications has led to instances in which she has run out of pain medication, suggesting that her pain is not as severe and unremitting as she has alleged." *Id.* While Plaintiff argues that the ALJ failed to adequately consider her reasons for rejecting other treatment, a review of the record reveals that the ALJ repeatedly referenced Plaintiff's reasons for rejecting recommended treatments, but found they were inconsistent with the record. *See* Tr. at 34 (Mr. Ard noted that Plaintiff had just started taking Meloxicam and reported she was afraid of needles. "He said that the claimant did not want to proceed with the injections at the time and wanted to give the medication a chance to work."), 37 ("When asked why she has refused injections in her knees, the claimant said that Dr. Holford has told her that Cortisone injections would not do any good. Further while he and her other doctor, Dr. Carter have recommended injections into her knee in the past, she has a phobia of injections and has never liked needles."), 39 ("While she claims she is

33

too afraid of injections to have an injection of her knee, she has been able to have her blood drawn for laboratory testing."). Thus, the ALJ considered Plaintiff's reasons for not pursuing additional treatment, but rationally concluded that her level of treatment was inconsistent with the functional limitations she alleged.

The ALJ did not fail to consider a later disability onset date, but found that the record as a whole did not suggest that Plaintiff was completely disabled at any time. Although the ALJ pointed out that Plaintiff denied arthralgias, muscle aches, and muscle cramps in March 2011 and certified that she was ready, willing, and able to work as she collected unemployment benefits from January 2010 until early 2012, she also acknowledged that Plaintiff's knee pain increased in severity in 2012. Tr. at 38–39. The ALJ noted that Plaintiff informed Dr. Carter in May 2012 that her knee pain did not slow her down too much and that she could deal with her symptoms. Tr. at 39. She concluded that "contrary to her allegations of debilitating pain and severely impaired function, the claimant has told her treating doctors that her impairments do not significantly limit her activities." *Id.* Thus, the ALJ discounted Plaintiff's credibility because she gave inconsistent statements throughout the record. The consistency of an individual's statements is particularly relevant to the credibility assessment. *See* SSR 96-7p (ALJs should consider the consistency of the individual's statements with the medical signs and laboratory findings and other information provided by medical sources. They should evaluate the consistency of the individual's own statements throughout the record. They should also consider the consistency of the individual's statement with other information in the case record, including reports and observations from others concerning the

individual's ADLs, behavior, and efforts to work.). Therefore, the ALJ did not err in failing to consider a later onset date, but rationally concluded that Plaintiff's statements did not support a finding that she was incapable of all work.

The ALJ appropriately considered Plaintiff's ADLs. An individual's ADLs are among the evidence that an ALJ should consider in assessing her credibility. SSR 96-7p. The ALJ pointed out that Plaintiff was the primary caretaker for her two daughters, ages eight and 13. Tr. at 40. She acknowledged Plaintiff's testimony that she received some assistance from family members and had her children perform some chores, but noted that she walked her youngest child to the bus stop, attended church services, and looked for work during part of the period she alleged she was disabled. *Id.* Plaintiff cites several cases that indicate the Commissioner cannot rely solely on an individual's ability to perform minimal ADLs to support a finding that the individual is capable of working. *See* ECF No. 13 at 35, citing *Higginbotham v. Califano*, 617 F.2d 1058 (4th Cir. 1980); *Cornett v. Califano*, 590 F.2d 91 (4th Cir. 1978), *Hight v. Shalala*, 986 F.2d 1242 (8th Cir. 1993); *Miller v. Sullivan*, 953 F.2d 417 (8th Cir. 1992); *Thompson v. Sullivan*, 987 F.2d 1482 (10th Cir. 1993); *Totten v. Califano*, 624 F.2d 10 (4th Cir. 1980); *Thorne v. Weinberger*, 530 F.2d 580 (4th Cir. 1976). However, the undersigned notes that the ALJ did not rely solely on Plaintiff's ADLs in assessing her credibility. She also cited the medical evidence of record, the inconsistency between Plaintiff's statements to her physicians and her testimony, the inconsistency between her assertions in collecting unemployment benefits and her testimony, and her failure to pursue additional medical treatment options. The Fourth Circuit has found no error in cases in which ALJs

considered individuals' routine ADLs in combination with additional evidence that undermined their credibility. *See Kearse v. Massanari*, 73 F. App'x 601, 603 (4th Cir. 2003) ("Additionally, several inconsistent statements by Kearse are contained in the record . . . . Moreover Kearse's activities of daily living, as previously described, do not support his subjective allegations. Thus, we find that the ALJ properly evaluated Kearse's credibility."); *Yost v. Barnhart*, 79 F. App'x. 553, 556 (4th Cir. 2003) ("Yost's x-rays and MRI's were consistently normal, a physical therapist noted no correlation between Yost's subjective pain and his demonstrated physical ability upon testing, and his activities of daily living, as noted previously, further undermine such allegations."); *Mickles v. Shalala*, 29 F.3d 918, 921 (4th Cir. 1994) ("In an extended, comprehensive discussion, he cited many additional reasons, all derived from the circumstances of Mickles' everyday life, for finding her testimony not credible . . . . The only fair manner to weigh a subjective complaint of pain is to examine how the pain affects the routine of life."). Here, the ALJ's rationale was supported by substantial evidence because she relied on Plaintiff's ADLs in combination with a number of other factors that suggested Plaintiff was not as limited as she alleged.

In light of the foregoing, the undersigned recommends the court find the ALJ considered the whole record, weighed Plaintiff's statements, articulated the reasons for the weight she accorded to Plaintiff's statements, and reached a credibility determination that was supported by substantial evidence.

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the Commissioner, but to determine whether her decision is supported as a matter of fact and law. Based on the foregoing, the undersigned recommends the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

February 26, 2016                    Shiva V. Hodges
Columbia, South Carolina            United States Magistrate Judge

**The parties are directed to note the important information in the attached**
**"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).